**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-13268

————————————

BUCKELEW FARM, LLC (F.K.A. BIG K FARMS LLC),
BIG K LLC, TAX MATTERS PARTNER,

*Petitioner-Appellant,*

*versus*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

————————————

Petition for Review of a Decision of the
U.S. Tax Court
Agency No. 14273-17

————————————

Before ROSENBAUM, GRANT, and BRASHER, Circuit Judges.

PER CURIAM:

Between 1998 and 2006, Buckelew Farm, LLC (f/k/a Big K Farms, LLC) ("Buckelew") acquired eight parcels of land—consisting of around 1,561.65 acres ("Property")—in Jones County, Georgia, for $4,014,000. A few years later, in December 2013, Buckelew filed a deed granting a conservation easement to the Southeast Regional Land Conservancy, Inc. Then, on its 2013 tax return, Buckelew utilized the conservation easement to claim a $47.6 million charitable-contribution deduction.

The IRS eventually disallowed Buckelew's charitable-contribution deduction. It also determined that Buckelew had inaccurately valued the Property and the conservation easement, so it assessed penalties against Buckelew for the inaccuracy. Buckelew challenged the IRS's determinations.

The tax court split the difference. On the one hand, the tax court concluded that Buckelew properly claimed a charitable deduction based on the conservation easement. But on the other hand, the tax court agreed both that Buckelew overvalued the Property (and therefore overvalued the claimed charitable deduction) and that the IRS could assess accuracy-related penalties for Buckelew's gross overestimation of the Property's value.

The tax court rejected Buckelew's valuation of the Property for two independent reasons. First, it concluded that Buckelew's valuation relied on development proposals that were likely legally impermissible under Jones County's zoning re-

strictions. And second, it found more persuasive the IRS's experts' valuation of the Property; the IRS's experts, the court explained, chose stronger comparison properties and better accounted for the prevailing market conditions in 2013 Jones County.

Now, in its petition, Buckelew challenges the tax court's ruling. It asserts that its proposed development plans were legally permissible, and it complains about other evidentiary and procedural rulings the tax court made. After careful consideration, we reject Buckelew's attempt to overturn the tax court's decision.

Even if we were to accept each argument Buckelew raises, we could not disturb the tax court's ruling. Buckelew does not dispute the tax court's decision to favor the IRS's valuations of the Property; it contends only that its proposed development plans were legally permissible. But the tax court made clear that its finding that the IRS's experts better evaluated the Property was independent of its conclusion that Buckelew's development plans were likely legally impermissible. And the additional evidentiary issues about which Buckelew complains don't bear on the tax court's findings about the Property's value. So those complaints offer no reason to disturb the tax court's rulings on the sole issue decided against Buckelew. As a result, we deny Buckelew's petition.

## I

### A

Ryan Klesko and John Smoltz, two former Major League baseball players, formed Buckelew Farm, LLC. Between 1998 and

2006, Buckelew spent about $4 million to acquire about 1,562 acres in Jones County, Georgia, for its timber value and recreational uses, such as hunting and fishing.

In 2012, Buckelew tried to sell its property holdings. Klesko hoped to sell the Property for up to $14 million. But a real-estate agent who specialized in large hunting parcels, Matt Haun, doubted that the Property could fetch that price on the open market. Haun expected the Property to sell at a price between $3 and $3.5 million if forced to sell it. Other appraisals in 2010 and 2012 suggested the Property was worth roughly $6.7 million and $4 million, respectively. Still, Haun listed the property at $9 million. Over a period of six to twelve months on the market, Buckelew received no offers. One timber-management organization, Timbervest, considered purchasing the Property but concluded that the Property's timber was worth less than $6 million.

Although Buckelew received no outright offers to purchase the Property, James M. Adams, III, a Georgia lawyer in the real-estate industry, presented to Klesko and Smotlz a conservation-easement plan. That plan discussed the tax advantages of granting such an easement. Then, Adams organized Big Knoll Farms, LLC, to purchase the Property for around $6 million, drafted a plan that proposed developing an upscale residential community on the Property, and procured an appraiser, Jim Clower, who, based on the development plan, assessed the Property's value at $59,958,570 (its "before" value). Clower also concluded that,

24-13268                Opinion of the Court                5

should Buckelew deed a conservation easement to a conservatory, the Property's value (its "after" value) would fall to $4,129,886.

But Adams's development plan depended on at least the Jones County Zoning director's approval. In the absence of a variance, the proposed upscale residential development would not have been permissible under the then-existing zoning regulations. So Adams and Klesko met with the director, Tim Pitrowski, to discuss whether they could proceed with their development plans. After the meeting, and after Pitrowski conducted some due diligence, he issued an opinion letter from the Jones County Planning and Zoning Department concluding "it is 'more likely than not' that if the [2013 Land Plan] . . . were submitted to this jurisdiction for a formal approval, given the current rules and regulations as we currently understand and interpret them, the land use/subdivision plan would be approved."

Still, the letter advised that Buckelew would have to "follow all the rules and regulations for said land use" and "obtain all approvals and prerequisite permits for the subject property prior to commencing any development." That's important because Adams and Klesko did not disclose to Pitrowski some information about the development plan. For instance, they did not raise that the plan would use gravel roads. Nor did they explain their plans to use septic systems, other infrastructure, and utilities.

Even so, with Pitrowski's opinion letter in hand, Buckelew forged ahead with its conservation-easement plan. Adams hired Daly Hayter, Jr., to appraise the Property again. Hayter valued

the Property at $50,480,00 "before" the granting of a conservation easement based on Adams's development proposal—that is, the plan for a 307-lot hunting and conservation oriented residential community. Hayter thought the market would well receive Adams's plan. But unable to identify similar properties to support his valuation, he employed a discounted-cashflow, rather than comparable-sales, analysis. In other words, rather than pin the Property's value to comparable properties that already sold, Hayter valued the Property by adding the present value of the Property's expected cashflow to its residual value. Heyter adjusted lot prices from other developments in Georgia and South Carolina and assumed that all 307 lots in the hypothetical development would sell within ten years.

He thus estimated that the Property had a fair market value of around $50.5 million before the conservation easement and $2.7 million after the conservation easement. In turn, he calculated that a conservation easement could warrant a roughly $47.6 million potential charitable-contribution deduction: From his roughly $50.5 million "before" valuation, he subtracted $2.7 million ("after" valuation) and $230,000 (the value enhancement from the conservation easement).

After the rest of Adams's conservation-easement plan had been executed, Buckelew filed a deed granting a conservation easement to the Southeast Regional Land Conservancy, Inc. And then, on its 2013 tax return, Buckelew claimed a charitable-contribution deduction of $47,570,000 and reported an adjusted

basis in the Property of $3,521,827. Buckelew attached Hayter's appraisal documents to its return, and Adams signed the return on behalf of Buckelew.

**B**

On March 30, 2017, the IRS issued Buckelew a Final Partnership Administrative Adjustment ("FPAA"), asserting that Buckelew could not deduct the $47,605,000 charitable contribution; the conservation easement did not meet all the requirements of I.R.C. § 170 and the corresponding Treasury Regulations governing noncash charitable contributions. The IRS also determined that a 40% accuracy-related penalty was appropriate under 26 U.S.C. § 6662(a), (h) because Buckelew grossly misstated the conservation easement's value. In the alternative, the IRS imposed a 20% penalty under 26 U.S.C. § 6662(a), (b)(1)–(3) for a substantial valuation misstatement.

On June 27, 2017, Buckelew timely filed a U.S. Tax Court Petition, challenging the IRS's determinations. And on September 25, 2017, the IRS filed its Answer. But, after discovery, in February 2021, the IRS moved to amend its Answer to add a fraud claim, asserting Adams acted on Buckelew's behalf with fraudulent intent. The Tax Court granted the IRS leave to file an amended answer, acknowledging the IRS's delay in levying the fraud claim but concluding "nothing in the record . . . would support a finding that [Buckelew] would suffer unfair surprise or prejudice as a result of [the IRS's] amendment."

The tax court then held a multi-part trial and issued a subsequent opinion. Broadly, the tax court entered three important holdings. First, the tax court concluded that Buckelew's conservation easement qualified as a charitable contribution worthy of a tax deduction. Second, it held that Buckelew grossly overstated the value of the conservation easement. In turn, the tax court concluded the IRS properly assessed a 40% penalty under 26 U.S.C. § 6662(a), (h). And third, it rejected the IRS's fraud claim because most of the evidence indicative of fraud did not relate to Buckelew's tax return; the IRS did not prove by clear and convincing evidence that Buckelew intended to evade taxes in filing its return.

We zoom in on the second issue because Buckelew challenges the tax court's ruling with respect to it. The tax court rejected Buckelew's valuation of the Property for two reasons.

First, the tax court doubted that Adams's development plan was legally permissible. Although Pitrowski issued a letter stating that the rezoning was "more likely than not," at trial, he explained he issued that opinion based on the information Adams and Klesko provided at the time. And at the time Pitrowski issued the letter, he was unaware that the proposed development planned to use gravel roads and community septic tanks.

Armed with this new information, Pitrowski testified that he would not have issued the same opinion. He explained that he would have had significant issues with the number of lots in the proposed development being served by gravel roads. Pitrowski

expounded that raised "concerns for ambulances and life safety vehicles gaining access." Plus, in 2013, a community septic system with a discharge of wastewater of over 10,000 gallons per day, like the septic system in Adams's development plan, required approval from the Georgia Environmental Protection Division. So Pitrowski also would have had to submit the proposal to the Georgia Department of Public Health, further impeding any opinion of approval he could have issued.

Based on Pitrowski's testimony, the tax court harbored "serious concerns as to whether the proposed development at the Subject Property was a legally permissible use."

Still, the tax court did not rest its decision solely on Pitrowski's testimony. Rather, the tax court explained that "even if [it] [were] to accept that the proposed development was a legally permissible use of the Subject Property, [it] must also determine whether the proposed development was physically possible, financially feasible, and maximally productive." So the tax court assessed the experts' valuations of the Property's highest and best use and favored the IRS's valuation.

Second, the tax court found more accurate the IRS's valuation of Buckelew's charitable contribution. Hayter, according to the tax court, based his analysis on properties that could "fairly be classified as high-end luxury resorts far from Jones County, with vastly different market conditions and amenity offerings." And even with the adjustments to the lot prices, the tax court concluded, Hayter's values "far exceed[ed] the price that the proposed de-

velopment might garner in the market." In the tax court's view, Hayter overlooked information about the market conditions in the counties containing his comparable properties. And he failed to analyze how those conditions compared to the ones in Jones County.

By contrast, the IRS's lead expert, Zac Ryan, employed a comparable-sales method based on other Georgia properties to conclude that the fair market value of the Property was $7.4 million before the conservation easement ("before value") and $2.8 million after the conservation easement ("after value"), resulting in a $4.6 million valuation for the conservation easement. In explaining his position, Ryan proffered that the Property "was not ripe for development" based on "a detailed analysis of the market conditions in Jones County." Ryan relied on "land use patterns, building permit activity, population growth trends," and more "to support his conclusion that, in 2013, Jones County was still suffering the consequences of the 2008 housing market crash and that there was no indication that there would be a significant positive change . . . in the foreseeable future." Ryan's valuation, the tax court added, also relied on properties with attributes that could have sustained developments like those in Adams's proposal.

The tax court ultimately found Ryan's methodology persuasive. It accepted Ryan's argument that "a hypothetical buyer will not pay more for a given property when an alternative property is available for less." So, the tax court added, Ryan's estimate "undermine[d]" Buckelew's, "since a willing buyer would not

have paid roughly $32,600 ($50,480,000 / 1,545.79 acres) per acre for nonunique vacant land in Jones County when the price per acre for substitute properties identified by [the IRS's] expert was between $1,602 and $4,971." For these reasons, the tax court concluded, Ryan's "before" value of $7,395,000 was "the proper value" of the Property. So the court adopted it, along with Ryan's "after" value of $2.8 million and the resulting allowable charitable contribution-deduction of $4.6 million. And because the value of the easement claimed on the return ($47.6 million) was more than 200% of the correct amount ($4.6 million), the tax court approved a 40% penalty for Buckelew's "gross valuation misstatement," in accordance with 26 U.S.C. § 6662(a), (h).

Buckelew timely petitioned for review.

## III

We review a tax court's legal conclusions and interpretations of the tax code de novo. *Ocmulgee Fields, Inc. v. Comm'r*, 613 F.3d 1360, 1364 (11th Cir. 2010). We also review a tax court's application of the law to the facts de novo. *Est. of Wallace v. Comm'r*, 965 F.2d 1038, 1044 (11th Cir. 1992).

But we review a tax court's findings of fact for clear error. *Est. of Jelke v. Comm'r*, 507 F.3d 1317, 1321 (11th Cir. 2007) (citing *Est. of Blount v. Comm'r*, 428 F.3d 1338, 1342 (11th Cir. 2005)). That's a "highly deferential standard of review." *Holladay v. Allen*, 555 F.3d 1346, 1354 (11th Cir. 2009) (quoting *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005)). "A finding that is plausible in light of the full record—even if another is

equally or more so—must govern." *Sweet Additions Ingredient Processors, LLC v. Meelunie Am., Inc.*, 139 F.4th 1217, 1225 (11th Cir. 2025) (per curiam) (quoting *In re Wagner*, 115 F.4th 1296, 1305 (11th Cir. 2024)).

As relevant here, a "determination of fair market value is a mixed question of fact and law: the factual premises are subject to a clearly erroneous standard while the legal conclusions are subject to de novo review." *Palmer Ranch Holdings Ltd v. Comm'r*, 812 F.3d 982, 994 (11th Cir. 2016) (quoting *Est. of Jelke*, 507 F.3d at 1321). In other words, the "mathematical computation of fair market value is an issue of fact" but the appropriate valuation method is an issue of law we review de novo. *Est. of Jelke*, 507 F.3d at 1321 (quoting *Est. of Dunn v. Comm'r*, 301 F.3d 339, 348 (5th Cir. 2002)).

## IV

Buckelew argues the tax court erred in three ways. First, it asserts the tax court improperly concluded Adams's development plan was likely legally impermissible, suggesting the tax court did not give sufficient weight to Pitrowski's opinion letter. Second, Buckelew charges that the tax court abused its discretion by projecting Adams's personal tax return in open court and admitting the return into the evidentiary record, in violation of 26 U.S.C. § 6103(a) and the Internal Revenue Code's privacy protections. And third, Buckelew suggests the tax court abused its discretion by allowing the IRS to amend its Answer to seek civil-fraud penalties.

Plus, Buckelew claims the sum of the tax court's errors constitute structural error that requires reversal.

Based on Buckelew's arguments, we see no reason to disturb the tax court's rulings.  The tax court's conclusion that Buckelew overclaimed a charitable deduction on its 2013 tax return follows from its factual findings that, assuming Adams's development plan was legally permissible, the IRS's expert properly valued the Property at $7,395,000.  But Adams makes no argument attacking that conclusion.  So Buckelew's argument about the legal permissibility of its plan does not make a difference in this appeal.  Nor do Buckelew's remaining arguments: the introduction of Adams's tax return and the IRS's amended Answer both concerned the fraud claim that the tax court resolved in Buckelew's favor.  None of these things affect, let alone infect to the level of structural error, the tax court's resolution of the sole issue it decided against Buckelew: the value of its claimed charitable deduction.

We take each issue in turn.

**A**

"Taxpayers who underpay their taxes due to a 'valuation misstatement' may incur an accuracy-related penalty."  *United States v. Woods*, 571 U.S. 31, 43 (2013).  "The degree of a misstatement determines the severity of the penalty": A 150% or more misstatement incurs a 20% penalty, and a 200% or more misstatement incurs a 40% penalty.  *TOT Prop. Holdings, LLC v. Comm'r*, 1 F.4th 1354, 1369 (11th Cir. 2021).  The Internal Revenue

Code assesses misstatements of the "value of a conservation easement" relative to "the fair market value of [it] at the time of the contribution." *Id.* (quoting 26 C.F.R. § 1.170A-14(h)(3)(i)).

Generally, we calculate the fair-market value of an easement "based on sales prices of comparable easements," but, if no comparators are available, we use "the 'before-and-after' valuation method." *Id.* The before-and-after method looks to "the difference between the fair market value of the property pre- and post-encumbrance." P*ine Mountain Pres., LLLP v. Comm'r*, 978 F.3d 1200, 1211 (11th Cir. 2020) (citing 26 C.F.R. § 1.170(A)-14(h)(3)(i)).

Buckelew does not challenge "the Tax Court's use of the method, . . . nor the 'after' valuation in any way." *TOT Prop. Holdings*, 1 F.4th at 1369. Instead, it takes issue primarily with "the court's factual determinations related to the conclusion regarding the highest and best use of the property before the donation of the easement." *Id.*

The highest and best use of a property is a "reasonable and probable use that supports the highest present value," focusing "on 'the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.'" *Palmer Ranch*, 812 F.3d at 987 (quoting *Symington v. Comm'r*, 87 T.C. 892, 897 (1986)). In applying the highest-and-best-use standard, courts account for several factors, including (1) the current use of the property, (2) the likelihood that the property would be developed absent the easement, (3) how the property would be developed, and (4) "any effect from zoning, conserva-

tion, or historic preservation laws that already restrict the property's potential highest and best use." *TOT Prop. Holdings*, 1 F.4th at 1369 (quoting 26 C.F.R. § 1.170A-14(h)(3)(ii)).

Buckelew contends the tax court erred in assessing the effect of Jones County's zoning restrictions on the Property by relying on Pitrowski's testimony instead of his opinion letter. In Buckelew's view, Buckelew detrimentally relied on Pitrowski's letter, so Georgia law vests in it a right to the zoning accommodations it procured from Pitrowski. In turn, Buckelew asserts, "it was reasonably probable that the Property would be developed in accordance with" Adams's "plan." Petitioner's Br. at 19.

But even if we assume Buckelew's argument about Georgia law is correct—and therefore assume the tax court erred in expressing doubts about the legal permissibility of Adams's development plan—those assumptions would not undermine the tax court's ruling. Alternatively, the tax court assumed Adams's plan was legally permissible. Yet still, based on other relevant factors, the tax court found the proposed development was not the highest and best use of the property or, if it was the highest and best use, that the development plan could not support a $47.6 million valuation. As it explained,

> [E]ven if we are to accept that the proposed development was a legally permissible use of the Subject Property, we must also determine whether the proposed development was physically possible, financially feasible, and maximally productive. There-

fore, when considering the remaining highest and best use factors, we are inclined to accept the opinions and conclusion of Mr. Ryan[.]

Tax Court Op. at 54 (emphasis added). Legalities aside, as a factual matter, the tax court simply doubted that Buckelew's development prospects were financially viable. The tax court credited Ryan's "detailed analysis market conditions in Jones County," including his assessment that, in 2013, "Jones County was still suffering the consequences of the 2008 housing market crash." So it found that the Property "was not ripe for development." The tax court also noted that similar properties, which "had attributes that lent themselves to being developed in a manner similar to the proposed development," sold for far less than Buckelew's asserted valuation. Because a "hypothetical buyer will not pay more for a given property when an alternative property is available for less," the tax court explained, there is little reason to think a willing buyer would have paid $32,600 per acre for the Property. After all, a buyer could simply purchase substitute properties for exponentially less: per-acre prices ranging from $1,602 to $4,971.

In all, Buckelew formed its $50,480,000 valuation "on the basis of the proposed development's actually being built, and not on the basis of the value of the underlying property." But Buckelew offered no reason to think "the plan for the proposed development could not be applied to Mr. Ryan's comparable properties or [that] the qualities or attributes of the Subject Prop-

erty make it particularly unique in its state as a vacant parcel." In other words, if Adams's plan were a "reasonable and probable use" of the Property, other properties' values would have reflected that reality in their sales prices. *Palmer Ranch*, 812 F.3d at 987 (quoting *Symington*, 87 T.C. at 897). But because the substitute properties were available at lower prices, the tax court found "the probability of development at the selling price of $50,480,000" to be "firmly planted somewhere in the realm of fantasy."

We have no basis to disturb the tax court's assessment of Ryan's testimony. For one thing, Buckelew does not challenge it, so it waived any argument that the tax court erred in favoring the IRS's expert's analysis. *See Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1229 (11th Cir. 2025). And in any case, we see no clear error in the tax court's reasoning: it resolved the parties' factual dispute based on viable expert testimony, as well as the pertinent facts and data on which the experts relied. In light of the full record, the tax court's finding about the conservation easement's value is, at the very least, "plausible." *Sweet Additions*, 139 F.4th at 1225 (quoting *In re Wagner*, 115 F.4th at 1305).

In reply, Buckelew tries to salvage its position by asserting that a determination of a property's highest and best use depends on an "integrated analytical framework" and that an "error in the application of any single factor necessarily infects the entire highest and best use determination." Petitioner's Reply Br. at 8. We are not persuaded.

It is logically consistent to hold that a proposed use of a property is both legally impermissible and financially inviolable. The highest and best use of a property is ultimately a question of a purchaser's "willingness to pay"; if a proposed use is "too risky" for a hypothetical buyer to consider in deciding how much to pay for a property, then we will not consider that use the property's highest and best. *Palmer Ranch*, 812 F.3d at 1000 n.14. Both legal and business risk can doom a proposed use of a property, and Buckelew offers no reason to think otherwise.

In any event, even if Buckelew were correct that it's not possible to have multiple, independent bases for rejecting a proposed best-and-highest use of a property, Buckelew still would not prevail. We've distinguished the "determination of the property's highest and best use," *TOT Prop. Holdings*, 1 F.4th at 1369, from the calculation of the "dollar value based on that use," *id.* at 1370. Indeed, we've characterized the latter question as the next "step after determining the highest-and-best use." *Id.* And here, the tax court found that, even if Adams's proposed development plan were the best and highest use of the Property, its "dollar value based on that use" was erroneous. The IRS's expert identified substitute properties that could have sustained similar development plans, and those properties sold for far less on the market. So the other properties Ryan identified suggest the Hayter appraisal significantly inflated the Property's market value. And, again, with respect to the tax court's factual determination of the Property's dollar value, Buckelew offers no reason to think the tax court clearly erred. *Cf. id.* at 1371 (rejecting appellants' arguments

because their disagreement with tax court's reliance on certain properties as comparators did not amount to clear error in the tax court's "valuation findings").

In short, Buckelew's qualms with the tax court's assessment of the legal permissibility of Adams's development plan do not undermine the tax court's valuation of the Property and the conservation easement that formed the basis of its claimed deduction.

**B**

Buckelew's next argument—about the alleged violations of the Internal Revenue Code's privacy protections—is irrelevant to its petition's efforts to set aside the tax court's ruling on Buckelew's deduction. The Internal Revenue Code generally makes tax returns and return information confidential. *See* 26 U.S.C. § 6103. But exceptions do exist, like when a person is a party to a tax proceeding that pertains to tax administration. *See id.* § 6103(h)(4)(a).

Here, the IRS sought to admit Adams's tax return into the record to prove its fraud claims against Buckelew, and the district court admitted the return. Plainly, the dispute over the admissibility of the tax return is unrelated to the tax court's adverse ruling. After all, the tax court found for Buckelew on the IRS's fraud claim.

Plus, even if it were pertinent to the valuation issue, any error would have been harmless. "[I]mposition of the exclusionary rule is not warranted for a disclosure of return information

which violates § 6103." *Nowicki v. Comm'r*, 262 F.3d 1162, 1163 (11th Cir. 2001). Congress instead created civil and criminal penalties for violations of § 6103. *See id.* "There is no statutory provision requiring exclusion of evidence obtained in violation of § 6103 and" we have declined "to invent one." *Id.* As a result, a violation of § 6103 could not cause us to disturb the tax court's ruling.

In sum, Buckelew's alleged violation of § 6103 does not offer a valid basis for overruling the tax court.

## C

Buckelew's third asserted error—that the tax court allowed the IRS to amend its Answer to assert a fraud claim—fails for the same reason: the tax court found for Buckelew on the fraud claim. In fact, because Buckelew prevailed on the fraud claim, it lacks standing to challenge the tax court's procedural ruling.

"Only a litigant who is aggrieved by the judgment or order may appeal." *Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1354 (11th Cir. 2003) (citation and internal quotation marks omitted). The tax court's disposition of the fraud issue "did not 'affect [Buckelew's] interests in an adverse way,'" so Buckelew "lacks standing to appeal that" issue: simply, there's no "adverse judgment." *Thomas v. Broward Cnty. Sheriff's Off.*, 71 F.4th 1305, 1313 (11th Cir. 2023) (quoting *United States v. Pavlenko*, 921 F.3d 1286, 1289 (11th Cir. 2019)).

## D

Finally, Buckelew contends that the sum of the tax court's mistakes results in a structural error that undermines the integrity of the tax-court proceedings. We see no basis in the record or case law for that assertion.

We recognize, as Buckelew repeatedly points out, that violations of § 6103 are serious and have the potential to "devastate an individual's life." *Diamond v. United States*, 944 F.2d 431, 434 (8th Cir. 1991). We also acknowledge that belated attempts to insert new claims into mature litigation can substantially prejudice parties. *See Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 623 (11th Cir. 1983). But even assuming the district court erred in admitting Adams's tax return and allowing the IRS to amend its Answer to insert a new fraud claim, we don't see how those errors "create[d] a trial environment so fundamentally unfair that it constitutes a paradigmatic structural error." Petitioner's Reply Br. at 16.

For the reasons we've already explained, those errors had *zero* effect on the tax court's assessment of the Property's value. And we have no reason to believe the asserted errors undermined, generally, the integrity of the tax-court proceedings. We reserve claims of structural error for denials of basic protections, like the denial "of the right to a jury verdict of guilt beyond a reasonable doubt," because the "precise effects" of such violations "are unmeasurable." *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993). By contrast, we routinely evaluate the harm or prejudice that results

from the erroneous admission of evidence or improper addition of a claim to a case. *See Arizona v. Fulminante*, 499 U.S. 279, 308 (1991) (discussing admission of evidence); *see Best Canvas Prods. & Supplies*, 713 F.2d at 623 (considering the prejudicial effect of amending a complaint). Subjecting Buckelew's asserted errors to traditional harmless-error review is nothing new.

So Buckelew's structural-error argument falls flat, too.

## V

For these reasons, we conclude Buckelew has not made an argument in its petition that can undermine the tax court's determination that Buckelew overstated the value of the Property on its 2013 tax return. So we affirm the tax court's judgment and dismiss Buckelew's petition.

**PETITION DISMISSED.**